UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | |
| | * | Criminal Action No. 1:25-cr-10417-IT |
| DANIEL ARAUJO GUERRERO, | * | |
| | * | |
| Defendant. | * | |

MEMORANDUM & ORDER

October 9, 2026

TALWANI, D.J.

A federal grand jury returned an indictment charging Defendant Daniel Araujo Guerrero with one count of Unlawful Reentry of a Deported Alien, in violation of 8 U.S.C. §§ 1326(a) and (b)(2), and one count of Possession with Intent to Distribute 40 Grams or More of Fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(vi). Indictment 1–2 [Doc. No. 16]. Defendant now moves to suppress evidence "seized by law enforcement agents from (1) an apartment building on September 17, 2025, and (2) a taxi he was traveling in when he was seized and subsequently arrested on the same date." Mot. to Suppress 1 [Doc. No. 41].

For the reasons stated herein, Defendant's Motion to Suppress [Doc. No. 41], along with his request for an evidentiary hearing, is DENIED.

## I. Background

### A. *The Investigations*

#### 1. State Narcotics Investigation

In June 2025, Massachusetts State Police ("MSP") detectives assigned to Essex County initiated a narcotics investigation "into the illegal distribution of fentanyl and crack cocaine within the City of Lawrence[.]" Mot. to Suppress Ex. A, at ¶¶ 16, 18 [Doc. No. 41-1] ("MSP Search Warrant Aff."). A confidential informant ("CI") advised detectives that he or she had

repeatedly purchased narcotics from a fentanyl and cocaine distributor known to the CI as "Eddie[.]" Id. ¶ 18. The CI provided the investigators with two phone numbers associated with Eddie and described him "as a[] Hispanic male in his forties . . . [who] typically always has a beard. . . . [W]hen Eddie grows his beard out, the side of the beard has been red color." Id.

Through the CI, investigators conducted controlled purchases of suspected narcotics from Defendant on July 26, August 16, August 23, and September 6, 2025. Id. ¶¶ 21–34. During the August and September transactions, investigators observed Defendant enter, exit, or station himself outside of 91 Summer Street in Lawrence. See id. ¶¶ 25–26, 30, 33.

On September 10, investigators from MSP, Lawrence Police, the Salem Police Department, and Homeland Security Investigations ("HSI") set up a controlled purchase of suspected fentanyl from Defendant using an undercover officer. Id. ¶ 35. Prior to meeting the undercover officer, Defendant exited "the front door of 91 Summer Street with a small duffle style bag" and dropped the bag inside a nearby vehicle. Id. ¶ 37. Defendant then "walked to the back of 91 Summer Street" and "walk[ed] up the outside stairs" of the building to enter the second floor. Id.

Investigators observed Defendant "looking out the third story window" of 91 Summer Street until he exited the front door once again to meet a black Mercedes stopped in front of the building. Id. ¶ 38. While speaking with the driver of the Mercedes, Defendant "drop[ped] what appeared to be a small black plastic bag on the ground." Id. Defendant then called the undercover officer, directed the officer to 91 Summer Street with instructions "as to where the bag was for the [officer] to pick up[,]" and then watched the officer from the third floor window. Id. ¶ 39. The undercover officer retrieved the bag, removed suspected fentanyl from the bag, and, after leaving $140 inside of it, "placed the bag . . . on the driveway separating 91 Summer Street from

[a neighboring building] before leaving the area." Id. Defendant then emerged from the direction of the back of 91 Summer Street, walked toward the driveway, and used the outside staircase to enter 91 Summer Street from the second floor. Id. ¶ 40.

Subsequent investigation revealed that an individual believed to be Defendant's relative lived at 91 Summer Street in Apartment 8. Id. ¶ 41. Apartment 8 is located on the third floor of the building. Id.

2. Homeland Security Investigation

On review of Defendant's criminal history records and Alien File, HSI agents determined that Defendant is a citizen of the Dominican Republic, who entered the United States without authorization or inspection on or about September 1, 2003. Opp'n Ex. 2, at ¶ 5 [Doc. No. 46-2] ("Shapiro Aff."). He was identified by federal immigration officers on January 16, 2005, and "was voluntarily deported" on January 19, 2005. Id.

On or before June 24, 2005, Defendant again entered the United States without authorization or inspection. Id. ¶ 6. While living in the United States, Defendant "used the name and social security number of one José Cruz-Guzmán[.]" Id. ¶ 7. Under this identity, Defendant was charged with, and received a continuation without a finding in Lowell District Court for, "one count of threatening to kill and one count of assault and battery with a dangerous weapon" in February 2008. Id. ¶ 8. In January 2013, Defendant, still using the Cruz-Guzmán identity, pleaded guilty in Bristol Superior Court "to one count of trafficking in cocaine and one count of possession of a Class A controlled substance and was sentenced to three-and-a-half years' imprisonment." Id. ¶ 9.

After he was released from state custody, Defendant, again using the Cruz-Guzmán identity, was charged in Lawrence District Court on June 18, 2015, "with one count of

conspiracy to violate a state drug law, one count of reckless operation of a motor vehicle, and one count of assault and battery with a dangerous weapon." Id. ¶ 10. In January 2016, Defendant pleaded guilty in the U.S. District Court for the District of Massachusetts to one count of identity theft, in violation of 18 U.S.C. § 1028(a)(7). Id. ¶ 11. He was sentenced to a fourteen-month term of incarceration, followed by one year of supervised release. Id.

After an interview with an immigration officer while in federal custody, Defendant was ordered removed from the United States on May 13, 2016. Id. ¶ 12. Immigration officers deported Defendant to the Dominican Republic on July 5, 2016. Id. ¶ 13.

On or before February 23, 2018, Defendant again entered the United States without authorization or inspection. Id. ¶ 14. On February 23, local police in Lawrence arrested Defendant on an outstanding warrant. Id. ¶ 15. His prior removal order was reinstated at that time. Id.

On January 6, 2021, Defendant pleaded guilty in the U.S. District Court for the District of Massachusetts to one count of unlawful reentry, in violation of 8 U.S.C. § 1326(a)(1) and (b)(2). Id. ¶ 16. The court sentenced Defendant to fifteen months of imprisonment and three years of supervised release. Id. On May 18, 2021, Defendant was again removed from the United States. Id. ¶ 17.

Based on the state narcotics investigation described supra, HSI believed Defendant illegally reentered the United States after his most recent deportation. Id. ¶¶ 18–27.

B. *The Search and Arrest Warrants*

1. Federal Arrest Warrant

On September 16, 2025, an HSI agent submitted an application for a criminal complaint "charging [Defendant] with one count of unlawful reentry, in violation of 8 U.S.C. § 1326(a)(1)

and (b)(2)." Opp'n Ex. 3 [Doc. No. 46-3]; Shapiro Aff. ¶ 2 [Doc. No. 46-2]. A Magistrate Judge approved the complaint and issued an arrest warrant for Defendant later that day. Opp'n Ex. 3 [Doc. No. 46-3]; Opp'n Ex. 4 [Doc. No. 46-4].

2. Search Warrant from Lawrence District Court

On September 17, 2025, an MSP detective sought a warrant authorizing "investigators to search 91 Summer Street, Apartment 8[,] in Lawrence, Massachusetts[,] and the person[] of Daniel Araujo Guerrero" for narcotics and other items. MSP Search Warrant Aff. ¶ 44 [Doc. No. 41-1]; id. at 17 (Addendum A). That day, a search warrant issued from Lawrence District Court authorizing the search of "91 Summer Street, Apartment 8, Lawrence, MA" and "the person . . . of . . . Daniel Araujo Guerrero[.]" Mot. to Suppress Ex. B, at ECF 1–2 [Doc. No. 41-2] ("Search Warrant"). Investigators were specifically permitted to search for controlled substances, "[p]roceeds of the sale of controlled substances[,]" paraphernalia and records associated with the sale of controlled substances, "[c]ell phones and documentary evidence of the use of cell phones[,]" relevant financial documents, "[k]eys and documents indicating residency or control of the premises[,]" and "safes or lockboxes located within the residence." Id. at ECF 3.

C. *The Final Controlled Buy*

On September 17, 2025, after investigators obtained the search and arrest warrants described supra, the undercover officer contacted Defendant to "arrange a transaction for five 'sticks[,]'" or approximately fifty grams, of fentanyl. Opp'n Ex. 12, at ¶ 7 [Doc. No. 46-13] ("Donaldson Decl."). Defendant "directed" the undercover officer to an alley abutting Summer Street. Id.

At approximately 12:20 p.m., officers surveilling 91 Summer Street observed Defendant walk down the building's rear exterior staircase, walk to the front of the building, and reenter the

building through the front door. Id. ¶ 8. Five minutes later, Defendant called the undercover officer to explain that "he would be bringing the fentanyl in one package and not in individual sticks." Id. ¶ 9. At 12:27 p.m., the undercover officer texted Defendant: "Im [sic] in the alley." Id. Approximately one minute later, officers observed a gray Honda CR-V (the "Honda") stop in front of 91 Summer Street. Id. ¶ 10; Opp'n Ex. 9, at 1 [Doc. No. 46-10] ("MSP Search Warrant Execution Rep."). Defendant exited the front door of 91 Summer Street and entered the back seat of the Honda "carrying a dark-colored plastic bag." Donaldson Decl. ¶ 10 [Doc. No. 46-13]; see MSP Search Warrant Execution Rep. 1 [Doc. No. 46-10].

D. *Vehicle Search and Arrest of Defendant*

Officers stopped the Honda as it began driving away from 91 Summer Street. Donaldson Decl. ¶ 11 [Doc. No. 46-13]. As officers approached the stopped vehicle, "they observed Defendant reaching to the right side of the front passenger seat." Id.; see Mot. to Suppress Ex. D, at 2 [Doc. No. 41-4] ("Lawrence Police Dep't Rep.") (reporting the same).

Officers removed the driver and Defendant from the Honda, handcuffed both men, and searched them. Mot. to Suppress Ex. F, at 00:43–01:45 [Doc. No. 41-6] ("McCrave BWC Footage"); Mot. to Suppress Ex. G, at 00:08–02:45 [Doc. No. 41-7] ("McDonald BWC Footage"). The HSI agent who searched Defendant found "two wallets" and a "large amount of [United States] currency" on Defendant's person. Opp'n Ex. 13, at ¶ 6 [Doc. No. 46-14] ("Shapiro Decl."). One of the wallets contained a "New York State learner's permit," which included a picture of Defendant and the name "Dewin Guerrero Rosario[.]" Id. "[T]wo sets of keys" were also found "on [Defendant's] person." MSP Search Warrant Execution Rep. 2 [Doc. No. 46-10].

The driver of the Honda explained to an officer that he was a taxi driver and that the Honda was a taxi operated by "Liberty Taxi." Opp'n Ex. 6.1, at 1 [Doc. No. 46-7] ("MSP Translated Tr.")[1]; McDonald BWC Footage 01:15–01:43 [Doc. No. 41-7]. An officer escorted the driver away from the Honda. McDonald BWC Footage 04:23–04:26 [Doc. No. 41-7].

Separately, several other officers stood by Defendant as an MSP Trooper spoke to him in Spanish. See McDonald BWC Footage 00:47–1:02 [Doc. No. 41-7]. Defendant denied living at 91 Summer Street and identified himself as "Derwin Guerrero." MSP Translated Tr. 1–2 [Doc. No. 46-7]; McCrave BWC Footage 01:01–02:22 [Doc. No. 41-6].[2] At the HSI Agent's request, the Trooper asked Defendant what he was reaching for in the Honda. MSP Translated Tr. 2 [Doc. No. 46-7]. Defendant referenced a bag belonging to him:

> Trooper: What were you looking for down there? You were trying to get something, what–
>
> Defendant: Where?
>
> Trooper: Here, inside the car.
>
> Defendant: No, a bag that I had.
>
> Trooper: A bag. He's saying a bag that he had.
>
> Defendant: My bag that's in there.
>
> Trooper: The bag in there?
>
> Defendant: Yeah.
>
> Trooper: It's his bag that's in there.

---

[1] The government submitted a transcript of the conversations captured on BWC footage between officers on the scene, Defendant, and the taxi driver, with the dialogue both in Spanish and translated to English. Where Defendant does not dispute the authenticity of the transcript or the accuracy of the translation, the court considers the transcript alongside the other available evidence submitted by the parties.

[2] During this interaction with Defendant, what appears to be a dark-colored bag can very briefly be seen in the space between the front passenger seat and front passenger door of the Honda. See McCrave BWC Footage 00:58–00:59 [Doc. No. 41-6]. The approximate timestamp on the footage is 12:30:08. Id.

MSP Translated Tr. 2 [Doc. No. 46-7]; see McCrave BWC Footage 02:40–03:02 [Doc. No. 41-6]. The Trooper then read Defendant his *Miranda* rights. MSP Translated Tr. 2–3 [Doc. No. 46-7]; McCrave BWC Footage 03:04–04:19 [Doc. No. 41-6].

Using a cell phone, the HSI agent who searched Defendant "used facial recognition technology . . . to scan [Defendant's] face." Shapiro Decl. ¶ 7 [Doc. No. 46-14]. "The program reported that [Defendant] was Daniel Araujo Guerrero." Id.; see McCrave BWC Footage 06:14–06:58 [Doc. No. 41-6]; McDonald BWC Footage 05:54–06:31 [Doc. No. 41-7]. With the same Trooper translating, the agent verbally identified Defendant as "Daniel Araujo Guerrero" and explained that there was both a warrant for Defendant's arrest and a search warrant being executed at 91 Summer Street. McCrave BWC Footage 06:53–07:23 [Doc. No. 41-6]; MSP Translated Tr. 4–5 [Doc. No. 46-7]; see McDonald BWC Footage 06:20–06:40 [Doc. No. 41-7]. At approximately 12:37 p.m., after Defendant repeated to the officers that he did not live at 91 Summer Street and stated that he was "just there with a friend[,]" the HSI agent walked Defendant to a police cruiser. Shapiro Decl. ¶ 9 [Doc. No. 46-14]; McCrave BWC Footage 07:22–08:29 [Doc. No. 41-6]; McDonald BWC Footage 07:43–08:36 [Doc. No. 41-7]; MSP Translated Tr. 5 [Doc. No. 46-7].

HSI agents at the scene of Defendant's arrest also determined that the taxi driver was unlawfully present in the United States. Shapiro Decl. ¶ 12 [Doc. No. 46-14]; see McDonald BWC Footage 08:04–08:40 [Doc. No. 41-7] (showing an HSI agent holding up his cell phone to photograph the driver's face). They arrested the taxi driver and "turned [him] over to Deportation Officers for removal proceedings." Shapiro Decl. ¶ 12 [Doc. No. 46-14].

While the first group of officers were interacting with Defendant, other officers remained with the Honda. McDonald BWC Footage 03:18–05:28 [Doc. No. 41-7]. With the front

passenger door closed and the driver's seat door and both rear doors open, officers searched the Honda's driver's seat area, back seat, back seat floor, and trunk. McDonald BWC Footage 03:18–05:28, 07:23–07:42, 08:54–09:15 [Doc. No. 41-7]. The officers did not observe anything of note. One of the officers then drove the Honda a short distance to park it on the side of the road. McDonald BWC Footage 09:13–10:08 [Doc. No. 41-7]. No further search of the Honda is captured on the BWC footage submitted to the court.

After securing Defendant in the police cruiser, the same HSI agent returned to the Honda and "participated in the search of the taxi." Shapiro Decl. ¶ 10 [Doc. No. 46-14]. Up to that point, no suspected narcotics had been located. Id. The agent described his participation in the search as follows:

> Once at the taxi, I opened the front passenger door. I immediately saw a black plastic bag with white lettering that had been wedged between the front passenger seat and the door. I took a photo of the bag where I found it. . . . Inside the bag, I found a green cellophane-wrapped package marked "50" on the outside. The package contained a chunk of powdery substance, consistent in appearance with fentanyl that had been broken off a larger piece. I took a photo of this package inside the taxi.

Id. ¶¶ 10–11; see MSP Search Warrant Execution Rep. 2 [Doc. No. 46-10] ("Inside of the Honda CR-V in the area where [Defendant] was reaching towards, [the HSI agent] located a black plastic bag with a green cellophane packaged [sic] marked '50' on the outside.").

"Because there was no other person present who could drive the taxi away from the scene, [an MSP Trooper] had the taxi towed." Shapiro Decl. ¶ 12 [Doc. No. 46-14]; see Lawrence Police Dep't Rep. 3 [Doc. No. 41-4] ("The vehicle [Defendant] was in at the time of the stop was towed from the scene[.]").

E. *Search at 91 Summer Street*

As the arrest of Defendant and search of the Honda proceeded, other law enforcement officers entered 91 Summer Street and walked up to the third floor. Mot. to Suppress Ex. H, at 00:01–00:31 [Doc. No. 41-8] ("Rajkowski BWC Footage"). The third floor is the location of Apartment 8, the subject of the search warrant; Apartment 7, located across the landing from Apartment 8; and a hallway running from the landing between Apartment 7 and the stairs, ending in an open area with a window facing the street below (the "window area").[3] MSP Search Warrant Aff. ¶ 41 [Doc. No. 41-1]; Donaldson Decl. ¶ 15 [Doc. No. 46-13]; id. ¶ 17 (diagram); see Rajkowski BWC Footage 00:26–00:30 [Doc. No. 41-8]; Mot to Suppress Ex. I, at 01:29–01:34, 02:02–02:50 [Doc. No. 41-9] ("Cain BWC Footage").

The officers attempted to unlock the door of Apartment 8 using the sets of keys found on Defendant's person but were unsuccessful. MSP Search Warrant Execution Rep. 2 [Doc. No. 46-10]; see Rajkowski BWC Footage 00:28–01:12 [Doc. No. 41-8]. When the officers received no response after knocking on the door and announcing their presence, they entered Apartment 8 by force. Lawrence Police Dep't Rep. 3 [Doc. No. 41-4]; Rajkowski BWC Footage 00:28–01:29 [Doc. No. 41-8]. Nobody was inside. Rajkowski BWC Footage 01:12–02:28 [Doc. No. 41-8]; Cain BWC Footage 01:34–01:52 [Doc. No. 41-9].

Officers searched the empty apartment and found clothing Defendant was previously seen wearing, "a large amount of [United States] currency in different denominations, a small

---

[3] The detective who obtained the search warrant believed the window area was part of Apartment 8 based on surveillance of 91 Summer Street. Donaldson Decl. ¶ 6 [Doc. No. 46-13]; see Opp'n Ex. 14, at ¶ 6 [Doc. No. 46-15] ("Strong Decl.") ("The room had a large window, which I recognized to be the same window through which I had seen [Defendant] conduct his drug trafficking activities.").

clear plastic bag containing suspected narcotics," and "government documents and mail" that did not belong to Defendant. Donaldson Decl. ¶ 18 [Doc. No. 46-13]; see MSP Search Warrant Execution Rep. 2 [Doc. No. 46-10] (describing "a large amount of [United States] currency" found inside a dresser and "a small clear plastic twist bag with tan powder . . . presumptively identified . . . as fentanyl" found in a kitchen cabinet). A drug-detection dog was later deployed in the apartment but did not alert to any other suspected narcotics. Def.'s Reply Ex. A, at 00:29–09:53 [Doc. No. 49-1] ("Cavagnaro BWC Footage").

At some point during their search, officers noticed a door in the apartment's bedroom area. Donaldson Decl. ¶ 16 [Doc. No. 46-13]. The door connected to the window area but was covered by a curtain and blocked by a mattress. See Rajkowski BWC Footage 01:48–01:50 [Doc. No. 41-8]; Cavagnaro BWC Footage 04:09–04:27 [Doc. No. 49-1]; Donaldson Decl. ¶¶ 16–17 [Doc. No. 46-13]. Officers moved the mattress and then opened the door into the window area. Donaldson Decl. ¶ 16 [Doc. No. 46-13]. The removal of the mattress and entry into the window area was not captured on the BWC footage submitted to the court.

An officer ultimately entered the window area, see Strong Decl. ¶¶ 6–7 [Doc. No. 46-15], where he:

> found a sofa, a chair, mail addressed to "Esmaden Santiago" and "91 Summer St.," ceiling tiles, a paint bucket, and cleaning supplies. [He] also found a keychain with keys that open the front door of Apartment 8. Underneath the sofa, [he] found multiple black plastic bags. Inside those bags, [he] found suspected narcotics. Behind the sofa, [he] found a hole in the wall. Inside that hole, [he] found a tablet and another black bag which did not contain narcotics.

Id. ¶ 7. In the MSP Search Warrant Execution Report [Doc. No. 46-10], the bags under the sofa were described as "black plastic bags . . . matching the bag [Defendant] had on him inside the Honda CR-V[.]" Id. at 2.

The "suspected narcotics" inside the bags, Strong Decl. ¶ 7 [Doc. No. 46-15], consisted of "numerous bags of tan power, white hard rock substance inside of a paper towel, clear plastic bags with white powder, clear plastic bags of blue M30 pills, and a tan substance wrapped in a green cellophane with the marking '20[,]'" MSP Search Warrant Execution Rep. 2 [Doc. No. 46-10]. The cellophane "was the same consistency as the green cellophane package" located in the Honda. Id. "A digital scale and a tablet were also located next to all the suspected narcotics."[4] MSP Search Warrant Execution Rep. 2 [Doc. No. 46-10]. The search of the window area is not captured on the BWC footage submitted to the court.

F. *Laboratory Analysis*

On December 4, 2025, the suspected narcotics recovered from execution of the search warrant and arrest of Defendant were accepted by a Drug Enforcement Agency ("DEA") laboratory in New York City. See Mot. to Suppress Ex. E, at ECF 2–6 [Doc. No. 41-5] ("DEA Rep.") (describing reception of four plastic bags, one of which contained a "[r]ock [l]ike" substance and three of which contained a "[p]owder[,]" and an unpackaged material in "[t]ablet" form); Mot. to Suppress 9 [Doc. No. 41]. DEA personnel tested the suspected narcotics and identified cocaine, cocaine base, fentanyl, and lidocaine. DEA Rep. ECF 6–7 [Doc. No. 41-5].

G. *Procedural History*

On September 23, 2025, a Magistrate Judge approved a second criminal complaint against Defendant, alleging one count of Possession with Intent to Distribute 40 Grams or More

[4] It is not clear whether the tablet "located next to" the suspected narcotics, MSP Search Warrant Execution Rep. 2 [Doc. No. 46-10], is the same tablet that was found inside the "hole in the wall" in the window area, Strong Decl. ¶ 7 [Doc. No. 46-15].

of Fentanyl, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B)(vi). Sept. 23, 2025 Compl. ECF 1 [Doc. No. 2].

Approximately one month later, a federal grand jury returned an indictment charging Defendant with one count of Unlawful Reentry of a Deported Alien, in violation of 8 U.S.C. §§ 1326(a) and (b)(2), and one count of Possession with Intent to Distribute 40 Grams or More of Fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(vi). Indictment 1–2 [Doc. No. 16]. Defendant entered a plea of not guilty as to both counts. Elec. Clerk's Notes [Doc. No. 20].

Defendant subsequently filed the pending Motion to Suppress [Doc. No. 41]. The government opposes the motion.

## II. Discussion

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. Searches conducted without a warrant are "per se unreasonable under the Fourth Amendment . . . subject only to a few specifically established and well-delineated exceptions." Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) (quoting Katz v. United States, 389 U.S. 347, 357 (1967)). If a warrantless search does not fall within an exception, evidence seized during that search may not be used against the defendant, Wong Sun v. United States, 371 U.S. 471, 488 (1963), and instead is suppressed "to deter future Fourth Amendment violations[,]" Davis v. United States, 564 U.S. 229, 236–37 (2011).

"To prevail on a claim that a search or seizure violated the Fourth Amendment, a defendant must show as a threshold matter that he had a legitimate expectation of privacy in the place or item searched." United States v. Battle, 637 F.3d 44, 48 (1st Cir. 2011) (citing Minnesota v. Olson, 495 U.S. 91, 95 (1990)). This inquiry involves a two-part test. First, the court asks "whether the individual, by his conduct, has exhibited an actual expectation of

privacy; that is, whether he has shown that he [sought] to preserve [something] as private." United States v. Bain, 874 F.3d 1, 12 (1st Cir. 2017) (alterations in original) (citation modified). Second, the court determines "whether the individual's expectation of privacy is one that society is prepared to recognize as reasonable." Id. (citation modified).

A. *Search at 91 Summer Street*

Defendant argues that suppression of the narcotics found in the window area on the third floor of 91 Summer Street is appropriate where the warrant obtained from Lawrence District Court "did not authorize a search of the dead-end room outside of Apartment 8" and Defendant "had a reasonable expectation of privacy in that space." Mot. to Suppress 14 [Doc. No. 41]. The government contends that the window area was a common area in which Defendant had no reasonable expectation of privacy. Opp'n 8 [Doc. No. 46]. In the alternative, the government asserts that the window area was appropriately searched as an appurtenance to Apartment 8, and, in an any event, officers "had a good-faith basis to believe the warrant covered" the window area. Id. at 11, 13.

As described supra, the search warrant specifically permitted a search of "91 Summer Street, Apartment 8, Lawrence, MA" and "the person of . . . Daniel Araujo Guerrero[.]" Search Warrant ECF 2 [Doc. No. 41-2]. It did not explicitly authorize a search of the window area or any other space inside 91 Summer Street. The court's analysis thus proceeds from the premise that "[i]f the scope of the search exceed[ed] that permitted by the terms of a validly issued warrant or the character of [a] relevant exception from the warrant requirement, the subsequent seizure is unconstitutional without more." Horton v. California, 496 U.S. 128, 140 (1990).

First Circuit precedent establishes that generally "a tenant lacks a reasonable expectation of privacy in the common areas of an apartment building." United States v. Hawkins, 139 F.3d

29, 32 (1st Cir. 1998); see, e.g., id. at 33 (unenclosed common basement area of twelve-unit apartment building); United States v. Brown, 169 F.3d 89, 92 (1st Cir. 1999) (lobby of apartment building); United States v. Cruz Pagan, 537 F.2d 554, 557–58 (1st Cir. 1976) (common garage of condominium complex); see also United States v. Werra, 638 F.3d 326, 331 (1st Cir. 2011) ("If the residence were comparable to a multi-unit apartment building, however, with distinct, complete living spaces, [the defendant's] privacy interest would not extend to common areas such as the foyer." (citation modified)).

Whether to describe the area subject to search "as 'common' is the heart of this matter[,]" and, accordingly, the court must normally "engage in what is necessarily a fact-specific inquiry, taking into consideration the nature of the searched location, and using [the First Circuit's] prior decisions for guidance." United States v. Rheault, 561 F.3d 55, 59–61 & n. 10 (1st Cir. 2009) (finding that the defendant, a second-floor tenant, did not have a reasonable expectation of privacy in a disabled washing machine on the third-floor landing)[5]; see United States v. Bain, 155 F. Supp. 3d 107, 116–117 (D. Mass. 2015) (considering, inter alia, the "small number of units and locked exterior door" of an apartment building, tenants' shared access to "areas traversed by the officers[,]" and the use of these areas "for egress and ingress to the apartment units"), aff'd, 844 F.3d 1 (1st Cir. 2017).

As to the subjective expectation of privacy, "[t]he relevant question is whether [Defendant] was 'seek[ing] to preserve as private' the evidence at issue." Rheault, 561 F.3d at 59 (quoting Katz, 389 U.S. at 351) (alteration in original). Here, although the window area did not

[5] The Rheault court contrasted the entryways at issue in United States v. Fluker, 543 F.2d 709 (9th Cir. 1976), and United States v. Drummond, 98 F. Supp. 2d 44 (D.D.C. 2000), which were immediately outside the apartments at issue.

have a door and could be viewed from the hall, the contraband in the area was found "[u]nderneath the sofa" and inside a "hole in the wall[,]" Strong Decl. ¶ 7 [Doc. No. 46-15], rather than in an open or obvious location. The narcotics themselves were wrapped in cellophane and placed in "black plastic bags" before they were hidden. MSP Search Warrant Execution Rep. 2 [Doc. No. 46-10]. Accordingly, Defendant's deliberate attempt to conceal the narcotics and accessories from the view of entrants to the window area "sufficiently evidences an intent to hide them, and thus demonstrates a subjective expectation of privacy." Rheault, 561 F.3d at 59; see United States v. Thornley, 707 F.2d 622, 624 (1st Cir. 1983) (holding defendant "me[t] the subjective expectation test" where "[h]is purpose in taking . . . records to [a storage area] was to hide them and their incriminating contents after the grand jury subpoena issued"); United States v. Hershenow, 680 F.2d 847, 855 (1st Cir. 1982) (similar).

The court next "consider[s] whether [Defendant's] subjective expectation, viewed objectively, is justifiable under the circumstances." Thornley, 707 F.2d at 624. Some characteristics of the window area suggest as much. The window area was, for example, on the top floor of 91 Summer Street, where only two of the building's eight units were located. Donaldson Decl. ¶¶ 15, 17 [Doc. No. 46-13]; accord Bain, 155 F. Supp. 3d at 116 (noting that the "small number of units" in a three-unit apartment building suggested "that the tenants in the building may have enjoyed a greater expectation of privacy" than they would have in "a larger building"). The area was not fully visible from the third floor landing and could only be accessed by walking down a short, narrow hallway connected to the landing or from the bedroom area of Apartment 8.

Conversely, several considerations undercut the reasonableness of Defendant's expectation of privacy in the window area. The window area was easily accessible to the tenants

of Apartments 7 and 8, and any person inside 91 Summer Street could enter the area simply by walking up to the building's third floor. See Bain, 155 F. Supp. 3d at 116 (emphasizing that "[t]he areas traversed by the officers—including the . . . staircase[] and second-floor landing—were shared spaces accessible to the tenants of three apartment units and their guests, the landlord, and the landlord's agents"); accord United States v. Bean-Bousseau, 648 F. Supp. 3d 348, 355 (D. Mass. 2023) (finding "curvature of the hallway" that made a "shared hallway" "difficult to see" did not defeat characterization of hallway as a common area). The officer who searched the window area found mail addressed to an individual who did not reside in Apartment 8, further evidencing the window area's accessibility to anyone in the building.

There was also no door, curtain, or other means of excluding people from the window area, and Defendant, who was not a tenant of 91 Summer Street and denied residing in the building, lacked any control over the area. See Thornley, 707 F.2d at 625 (affirming no reasonable expectation of privacy where, inter alia, defendant did not have a lease for the building's storage area that was searched and was not a tenant of the building); Bean-Bousseau, 648 F. Supp. 3d at 355 (finding non-tenant defendants "did not have control over [a shared hallway] or the right to exclude others from it"). And although some of the items found in the window area, such as "ceiling tiles, a paint bucket, and cleaning supplies[,]" Strong Decl. ¶ 7 [Doc. No. 46-15], are consistent with use of the area for storage, the window area is not a "designated storage area . . . in which a reasonable person would think that he could store items that were persona[l], or private, or of value, and be free from the scrutiny of the public." Rheault, 561 F.3d at 61 (quotation omitted).

In light of 91 Summer Street's layout and the specific characteristics of the window room, Defendant's expectation of privacy in the window area was not reasonable. See Rheault,

561 F.3d at 61 (holding that defendant's expectation of privacy was "objectively unreasonable" where "a potentially revolving cast of third-floor tenants and their guests had relatively unfettered access to the very area in which [the defendant] claims an expectation of privacy"). Accordingly, Defendant has not demonstrated that the search of the window area violated his Fourth Amendment rights.[6]

B. *Search of the Honda*

Defendant also seeks suppression of the narcotics found in the Honda because the search of the vehicle "was also conducted without a warrant and . . . no warrant exception applies." Mot. to Suppress 17 [Doc. No. 41]. The government argues that the search was lawful under the Fourth Amendment's automobile exception and as a search incident to Defendant's arrest. Opp'n 16, 19 [Doc. No. 46]. The government also asserts the narcotics found near the front passenger seat inevitably would have been discovered when an inventory search of the towed Honda was performed pursuant to MSP policy. Id. at 20. Finally, the government characterizes the narcotics as having been "abandoned" by Defendant "before he submitted" to officers. Id. at 21.

1. Automobile Exception

The automobile exception to the Fourth Amendment's warrant requirement allows a law enforcement officer to search a vehicle without a warrant so long as the officer has probable cause to believe that the vehicle contains contraband. See Carroll v. United States, 267 U.S. 132, 154 (1925). Where law enforcement has probable cause to search a container in a car, the automobile exception also allows the search of that container without first obtaining a warrant. See California v. Acevedo, 500 U.S. 565, 580 (1991) ("The police may search an automobile and

[6] The court need not reach the government's arguments as to the window area's appurtenance to Apartment 8 or the applicability of the good faith exception to the warrant requirement.

the containers within it where they have probable cause to believe contraband or evidence is contained.”).

Probable cause “is not a high bar[.]” Kaley v. United States, 571 U.S. 320, 338 (2014). “It does not require the fine resolution of conflicting evidence that a reasonable-doubt or even a preponderance standard demands[.]” Gerstein v. Pugh, 420 U.S. 103, 121 (1975). Rather, it exists where “the facts and circumstances within [the officers’] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent [person] in believing that the [arrestee] had committed or was committing an offense.” United States v. Figueroa, 818 F.2d 1020, 1023 (1st Cir. 1987) (quoting Beck v. Ohio, 379 U.S. 89, 91 (1964)). In evaluating the facts underlying a search, the relevant issue is “the collective information known to the law enforcement officers participating in the investigation,” rather than what is known by any individual officer. United States v. Azor, 881 F.3d 1, 8 (1st Cir. 2017).

Based on the record before the court, law enforcement officers had probable cause to search the Honda for evidence of narcotics where: (1) Defendant had agreed to provide an undercover officer with narcotics not long before officers stopped the Honda[7]; (2) around the

[7] Defendant notes that although the officers began planning for this “anticipated exchange . . . on September 16, 2025[,]” the plan was not mentioned in the search warrant affidavit submitted to the Lawrence District Court the same day. Mot. to Suppress 20 n.8 [Doc. No. 41]. He contends that because of this omission, the omission of the anticipated drug transaction in the Lawrence Police Department and HSI arrest reports, and “the fact that purported phone calls arranging such a transaction were evidently not recorded,” the planned exchange may not be used to show probable cause to believe the Honda contained evidence of drug dealing activity or immigration violations. Def.’s Reply 11 [Doc. No. 49]. The planned exchange was, however, memorialized in an MSP Search Warrant Execution Report [Doc. No. 46-10] submitted on September 17, 2026. See id. at 1. Given the different purposes of the writings, the court finds no meaningful “omission” warranting a hearing. But even if there is an “omission,” a Franks hearing is warranted only if the omission was necessary to the finding of probable cause. United States v. McLellan, 792 F.3d 200, 206–207 (1st Cir. 2015). Here, the information supports, rather than undermines, the probable cause showing presented to the Magistrate Judge.

time of the scheduled transaction, officers observed Defendant walk into a nearby alley, where he had previously dropped narcotics during the September 10 controlled buy, and enter the Honda "carrying a dark-colored plastic bag" shortly thereafter, Donaldson Decl. ¶¶ 9–10 [Doc. No. 46-13]; (3) after stopping the Honda, officers observed Defendant "reaching to the right side of the front passenger seat" as they approached the vehicle, id. ¶ 11; (4) before the front seat area was searched, Defendant stated he was reaching for "a bag that [he] had" when asked what he was "looking for down there" in that area of the Honda, MSP Translated Tr. 2 [Doc. No. 46-7]; McCrave BWC Footage 02:40–03:02 [Doc. No. 41-6]; and (5) during the undercover officer's controlled purchase of fentanyl from Defendant on September 10, described supra, Defendant used "a small black plastic bag" to carry the narcotics to the designated pick-up location, MSP Search Warrant Aff. ¶¶ 38–40 [Doc. No. 41-1]. In view of the totality of these circumstances, the officers had probable cause to believe that Defendant brought narcotics into the Honda and did not need a warrant to search the car, including any containers therein, that could conceal such contraband.

2. Inventory Search

In the alternative, the government argues that the plastic bag containing suspected narcotics would have inevitably been discovered because the Honda was subject to an inventory search under MSP policy. Opp'n 20–21 [Doc. No. 46]. Defendant contends that, after an MSP Trooper had "safely parked [the Honda] on the side of the road," impoundment was unnecessary "to protect the public, safeguard property, or serve any community caretaking, non-investigative purpose[,]" and "[t]he decision to impound the vehicle was . . . unreasonable and unlawful." Def.'s Reply 15 [Doc. No 49]. Defendant therefore concludes that the court "should not apply

the inevitable discovery doctrine" because "the evidence inside the [Honda] would not have lawfully been discovered through impoundment and then an inventory search[.]" Id. at 15–16.

The "inventory search" doctrine permits warrantless searches of vehicles if such searches are "carried out pursuant to a standardized inventory policy[,]" whether written or unwritten. See United States v. Hawkins, 279 F.3d 83, 85–86 (1st Cir. 2002). This exception is rooted in the concept that an inventory search is "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." Colorado v. Bertine, 479 U.S. 367, 381 (1987) (Marshall, J., dissenting) (quoting Cady v. Dombrowski, 413 U.S. 433, 441 (1973)). Stated otherwise, the inventory search exception's risks are tolerated only because "a police officer's discretion to impound a car is sufficiently cabined by the requirement that the decision to impound be based, at least in part, on a reasonable community caretaking concern and not exclusively on 'the suspicion of criminal activity.'" United States v. Coccia, 446 F.3d 233, 239 (1st Cir. 2006) (quoting Bertine, 479 U.S. at 375).

The validity of an inventory search necessarily includes Bertine's limitation that the search be "administered in good faith." 479 U.S. at 374; see also id. at 372 (noting that in that case, as well as in prior Supreme Court decisions upholding inventory searches, "there was no showing that the police, who were following standardized procedures, acted in bad faith or for the sole purposes of investigation."). An inventory search "must not be a ruse for a general rummaging in order to discover incriminating evidence. . . . The individual police officer must not be allowed so much latitude that inventory searches are turned into 'a purposeful and general means of discovering evidence of crime[.]'" Florida v. Wells, 495 U.S. 1, 4 (1990) (quoting Bertine, 479 U.S. at 376 (Blackmun, J., concurring)). Pretext may thus eviscerate the exception. See Coccia, 446 F.3d at 240 ("[T]here is no claim that the decision [leading to impoundment]

was pretextual."); United States v. Rodriguez-Morales, 929 F.2d 780, 787 (1st Cir. 1991) ("Here, the district court did not find that the impoundment was pretextual. . . .").

MSP policy permits the towing and impoundment of a vehicle "found upon any way, or on private property" without the vehicle owner's consent

> when the operator:
>
> a. Is arrested, not properly licensed, or is unable or otherwise unfit to safely operate the vehicle;
>
> b. There is no competent, alternative operator, who is:
>
>     1) Present at the scene before officers notify the tow company;
>
>     2) In physical possession of a valid driver's license; and
>
>     3) Approved by the owner, or someone clearly authorized by the owner, to drive the vehicle; and
>
> c. The vehicle is not lawfully parked.

Opp'n Ex. 10, at 2 [Doc. No. 46-11] ("MSP Towing Policy"). Any towed or impounded vehicle is subject to an inventory search "consist[ing] of a detailed inspection of the interior and exterior of the vehicle for damaged and missing parts, as well as to locate and record the contents of the vehicle."[8] Opp'n Ex. 11, at 1–2 [Doc. No. 46-12] ("MSP Vehicle Inventory Policy").

Although Defendant characterizes the arrest of the taxi driver by HSI agents as a pretense to enable the warrantless search of the Honda, see Def.'s Reply 12–16 [Doc. No. 49], the record indicates otherwise. Based on recorded conversations in the provided BWC footage, officers did

---

[8] Pursuant to the MSP Vehicle Inventory Policy [Doc. No. 46-12], an inventory search

> shall extend to all storage areas and compartments. This encompasses all open areas, including but not limited to floor areas, the area in and around the instrument panel and the rear deck above the rear passenger seat, the open area under the seats, the glove compartment and trunk, and other places where property may be kept.
>
> All closed but unlocked containers shall be opened and each article inventoried individually.

Id. at 2.

not have cause to believe the taxi driver was involved in Defendant's alleged narcotics activity. See, e.g., McDonald BWC Footage 05:36–05:49, 07:49–08:04 [Doc. No. 41-7]. But that issue is distinct from officers' inquiry into the taxi driver's legal status in the United States. After investigating the taxi driver's legal status on-scene using the same identification technology employed to identify Defendant, see McDonald BWC Footage 08:04–08:40 [Doc. No. 41-7], HSI possessed the requisite probable cause to arrest the taxi driver based on his allegedly unlawful presence in the United States, see Karamanoglu v. Town of Yarmouth, 15 F.4th 82, 87 (1st Cir. 2021) ("Probable cause exists when an officer, acting upon apparently trustworthy information, reasonably can conclude that a crime has been committed and that the suspect is implicated in its commission." (citation modified)).

Defendant also asserts that towing was unnecessary after an MSP Trooper "safely parked" the Honda "on the side of the road" and where "[t]here is . . . no indication that the officers ever even considered having someone else take the car away, as required by MSP policy." Def.'s Reply 15 [Doc. No. 49]. As to the first argument, that the Trooper had "safely parked" the Honda, id., is not necessarily equivalent to the Honda being "lawfully parked[,]" as set forth in the MSP Towing Policy [Doc. No. 46-11]. Defendant does not assert specifically that the Honda was lawfully parked or respond to the government's assertion to the contrary. See Opp'n 20 [Doc. No. 46] ("[A]gents towed the taxi because the operator was arrested, there was no competent alternative operator present, and the taxi was not lawfully parked.").

As to whether the officers "considered having someone else take the car away[,]" Def.'s Reply 15 [Doc. No. 49], the MSP Towing Policy [Doc. No. 46-11] permits towing when, in relevant part, "[t]here is no competent, alternative operator, who is . . . [p]resent at the scene before officers notify the tow company." Id. at 2 (emphasis added); see id. at 2 ("[MSP]

[m]embers shall consider reasonable alternatives before towing a vehicle, including . . . whether the owner or authorized operator in control of the vehicle wishes to allow a competent, alternative operator, who is present at the scene before the towing process is initiated, to take control of the vehicle[.]" (second emphasis added)); see also United States v. Vick, 145 F.4th 191, 195, 202 (1st Cir. 2025) (affirming that "officers had an objectively reasonable basis to impound the Altima" where, inter alia, "[t]he Altima . . . could not be legally driven by anyone[,]" even though the officers "did not ask [the vehicle owner] if some other individual was available to drive the car" before calling for a tow truck to impound the Altima).

Accordingly, where the Honda was towed and inventoried in accordance with MSP policies, and where the tow and impoundment of the Honda was not pretextual based on the available record, the court finds as an alternative ground that the alleged narcotics would inevitably have been discovered in a lawful inventory search and need not be suppressed. [9]

## III. Conclusion

For the foregoing reasons, Defendant's Motion to Suppress [Doc. No. 41] and request for an evidentiary hearing are DENIED.

IT IS SO ORDERED.

October 9, 2026

/s/ Indira Talwani
United States District Judge

[9] Where officers had probable cause relative to the presence of narcotics in the Honda and would have inevitably discovered the narcotics during an inventory search, the court need not reach the government's alternative arguments—namely, that officers "had probable cause to believe the taxi contained evidence of immigration and/or identity theft offenses[,]" the search of the front passenger seat area was a permissible search incident to arrest, and Defendant "had no expectation of privacy in the narcotics" after "abandon[ing]" them when encountered by officers. Opp'n 17–22 [Doc. No. 46].